IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEAH C. and FRANK RICHETTI, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 11-0256 |
| | ) | |
| v. | ) | District Judge Cathy Bissoon |
| | ) | Magistrate Judge Cynthia Reed Eddy |
| SAKS & COMPANY, d/b/a | ) | |
| SAKS FIFTH AVENUE, | ) | |
| SAKS INCORPORATED, d/b/a | ) | |
| SAKS INC., and SAKS FIFTH AVENUE | ) | |
| | ) | |
| Defendants. | ) | |

# REPORT AND RECOMMENDATION

## I. RECOMMENDATION

For the reasons that follow, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 53) be denied.

## II. REPORT

This is an action for wrongful discharge. Plaintiffs Leah C. Richetti ("Richetti") and her husband, Frank Richetti, bring claims of (1) retaliatory discharge for filing a workers' compensation claim, (2) violation of rights under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq., and (3) loss of consortium against defendant Saks Fifth Avenue ("Saks") arising from Saks's alleged termination of Richetti's employment on October 23, 2009. Saks has moved for summary judgment pursuant to Fed. R. Civ. P. 56(a) on Richetti's substantive claims, and in the event that the court denies summary judgment of the substantive

1

claims, Saks moves in the alternative for partial summary judgment on Richetti's request for punitive damages as well as front and back pay. The motion is ripe for review.

A. **FACTUAL BACKGROUND**

Leah Richetti worked for Saks Fifth Avenue as a personal shopping assistant at its Pittsburgh, Pennsylvania store from 1980 to 2009. During her employment, Richetti built several long-term customer relationships and received numerous awards for her success as a salesperson and superior job performance. Following the birth of her twin sons in 1999, Richetti switched from full-time status to part-time status, where she worked 15 hours per week at an hourly rate of $26/hour plus a 6 to 10 percent commission rate based on her sales volume.

Richetti filed two workers' compensation claims during her employment with Saks. Her first claim, which Saks opposed, involved an injury to her left thumb and was denied by the Commonwealth of Pennsylvania's Workers' Compensation Office of Adjudication on April 12, 2007. Richetti filed her second claim in November 2008, for a similar injury she sustained to her right thumb, which Saks also opposed.

1. Richetti's 2009 Medical Leave

In early July 2009, Richetti began receiving treatment for a torn meniscus in her right knee. Given her good health and active lifestyle, Richetti's orthopedist, Dr. Patrick DeMeo, recommended that she undergo surgery to repair the tear. Dr. DeMeo advised Richetti that she would not be able to work during the lengthy recovery period following the surgery. On July 23, after discussing the matter with Cheryl Zacour ("Zacour"), Saks's Human Resource

representative in Pittsburgh, Richetti applied for and was granted a leave of absence from August 1, 2009 to September 3, 2009.

Richetti and Saks dispute whether Zacour represented to Richetti during this meeting that her leave was considered FMLA leave, which would have protected her ability to return to her original position after her recovery from surgery, and the evidence in the record is unclear on this point. For example, on the "Saks Incorporated Application for Leave of Absence (Attachment G)" form, which Zacour filled out and Richetti signed at the July 23 meeting, the box labeled "Associate Family/Medical Leave (FMLA)" was not checked. However, Zacour affirmatively indicated on subsequent personnel paperwork that Richetti's leave was FMLA leave, and Saks's benefits department also sent Richetti a letter, dated September 1, 2009, characterizing her time out as "Medical Leave" in "accordance with FMLA guidelines." (ECF Nos. 38-16, 44-8 at p.162, and 38-20.)

In her deposition, Richetti testified that it was her impression from her meeting with Zacour that her leave would be "similar" to three previous leaves that she had taken in past years, one of which Saks's personnel paperwork indicates was covered by the FMLA. (Id. at 38-3, pp.65-67; 38-27.) Richetti further testified that she would not have elected to have the surgery if Zacour had informed her that her leave was not covered by the FMLA. Saks refutes this claim, and notes that Richetti scheduled the surgery with Dr. DeMeo before her July 23 meeting, and that she intended to proceed with the surgery regardless of how Saks classified her leave. Although Saks concedes that Zacour's subsequent indication that Richetti was on FMLA leave was an error on Zacour's part, Saks notes that Richetti never saw this subsequent paperwork. Ultimately, there is nothing in the record to definitively establish what representations Zacour

3

made to Richetti at the July 23 meeting, and the parties agree that nobody from Saks ever affirmatively informed Richetti that she was not on FMLA leave during her out-of-work recovery. Neither party took notes at the July 23rd meeting, and none of the conversations were recorded.

At her follow-up visit with Dr. DeMeo on August 28, 2009, Richetti learned that her knee was not healing properly and that she would need to extend her medical leave through at least the first week of September. Richetti promptly contacted Zacour, who instructed her to fax a doctor's note to Saks's office. Zacour then extended Richetti's medical leave for an additional week, through September 12, 2009.

2. Richetti's Second Workers' Compensation Claim & Extended Medical Leave

On August 21, 2009, while Richetti was out recovering from surgery, Workers' Compensation Judge Robert Steiner granted her November 2008 petition for benefits related to her right-thumb injury. Saks appealed Judge Steiner's decision on September 10, 2009.

After her August 28th appointment, Richetti visited Dr. DeMeo several times in September for additional follow-ups. At each of these visits, Dr. DeMeo told Richetti that her knee was not healing properly and that he could not clear her to return to work until the situation improved. Dr. DeMeo faxed letters to Saks to advise them of the delays in Richetti's recovery, which continued into the first week of October. Richetti alleges that she attempted to contact Zacour by phone several times beginning in mid-September to advise her of her continued difficulties, but could not reach her until September 25, 2009. Richetti testified that she felt Zacour was deliberately ignoring her calls, which alarmed her and prompted her to begin a log of

4

her attempts to reach Zacour; Zacour claims that she never received Richetti's messages. When Richetti did reach Zacour on September 25th, they discussed Richetti's ongoing recovery. Richetti advised Zacour that she did not know when Dr. DeMeo would clear her to return to Saks, to which she alleges Zacour replied, "we need you back now." (ECF No. 38-4 at p.90.) Zacour has no specific recollections of her conversation with Richetti other than that they discussed Richetti's ongoing rehabilitation.

Around October 5, 2009, Richetti called Zacour and informed her that she was still undergoing physical therapy and could not give a precise date for her return. Richetti alleges that Zacour told her that she had been out of work for too long and that the delay "was not good" for the store. (Id. at 94.) Richetti testified that she told Zacour that she would do her best to expedite her recovery so she could come back to work as soon as possible. Zacour only recalls asking Richetti when she would return to work. Again, neither party took detailed notes of what they discussed and the conversations were not recorded.

Three days later, on October 8, 2009, Saks's appeal of Judge Steiner's judgment in Richetti's favor of her second workers' compensation claim was denied.

### 3. Richetti's Separation From Saks

#### a. The Disputed Job Offer

On October 21, 2009, Richetti called Zacour and informed her that she would be able to return to work sometime before November 1st. The parties dispute what was discussed next. According to Richetti, Zacour informed her that her part-time position had been eliminated, and that the only job Saks could offer her was a part-time "by appointment only" position, which

would involve her scheduling appointments from home and notifying Saks of when she would be coming in to work. This "by appointment only" position paid $10/hour and entitled Richetti to receive a 3 percent sales commission. Richetti testified that she asked Zacour why her former position had been eliminated, but Zacour could not give her a specific answer.

Richetti alleges that she verbally accepted Zacour's offer for the "by appointment only" position, which she then alleges prompted Zacour to withdraw the offer in order to seek additional clarification from management, at which time the phone call ended. Zacour then called Richetti back and told her that she could offer Richetti only an on-call, or "contingent associate" position, which involved no guarantee of either hours or of ever being called to work. Richetti testified that Zacour told her that if she did not accept the contingent associate position by the close of business on October 23, 2009, she would be deemed to have voluntary left Saks's employment. When Richetti asked whether there were other open positions at Saks, including full-time positions, Zacour informed her that the contingent associate position was the only option available. Richetti alleges that this was untrue based on her knowledge of the store's staffing situations in other departments.

Zacour's account of the conversations is entirely different. At her deposition, Zacour testified that she offered Richetti a full-time sales associate position, which Richetti turned down because she only wanted to work part-time. Zacour alleges that she explained to Richetti that due to staffing changes and the evolving business needs of the Pittsburgh store, Saks required a full-time person in Richetti's position. Because Richetti was clear that she only wanted to work part-time, Zacour testified that the only other option she could offer was the contingent associate position. Zacour emphasized that these were the two options she presented to Richetti during

6

their October 21st phone conversations. Richetti denies that Zacour offered her full-time employment during their discussions. As with their previous calls, neither party took detailed notes, and the conversations were not recorded.

Richetti did not accept the contingent associate position by Saks's October 23, 2009 deadline; accordingly, Saks deemed her to have voluntarily quit her employment, effective October 25, 2009. Zacour completed an "Associate Separation Confirmation Document" detailing the circumstances of Richetti's separation, where she indicated that Richetti was offered a contingent associate position but resigned instead. There is no mention in the separation document of any alternative offer of full-time employment.

### b. Saks's Workers' Compensation Claims Policy

During Richetti's employment, Saks maintained an insurance policy with the Liberty Mutual Insurance Company to cover workers' compensation claims. As part of this policy, Saks had a $500,000 deductible, which included the costs of indemnity, medical costs, and legal fees. Thus, while Liberty Mutual wrote the checks to claimants, Saks was required to reimburse Liberty Mutual until the deducible was satisfied. Liberty Mutual worked with Saks's administrative staff in the Pittsburgh store, including Zacour, in addressing workers' compensation claims. Richetti's two workers' compensation claims fell within this arrangement.

In dealing with workers' compensation claims, Saks maintained an informal policy of insisting that employees resign as part of a settlement of a claim that Saks deemed to be meritless and, consequently, fraudulent. The purpose of this policy was to protect Saks from having to deal with future meritless and fraudulent claims that the employee might subsequently file. The

7

parties here do not dispute that Richetti did not want to resign as part of any potential settlement of her second workers' compensation claim. On November 4, 2010, the Workers' Compensation Appeal Board sustained Richetti's favorable decision.

    4.   <u>The Wrongful Termination Lawsuit</u>

Richetti contends that Saks retaliated against her for succeeding in her second workers' compensation claim by eliminating her position and offering her a subsequent "job" that involved no guaranteed work or pay, and that Saks led her to believe, in accordance with the FMLA, that she would be able to return to her previous position when she completed her recovery and that Saks violated her FMLA rights by eliminating her job instead. She also alleges that she has endured significant emotional strife as a result of Saks's actions. Richetti filed this action in the Court of Common Pleas of Allegheny County on January 28, 2011. Saks timely removed to this court on February 25, 2011.

**B.  <u>STANDARD OF REVIEW</u>**

Summary judgment is appropriate if the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In evaluating the motion, the court may not weigh the evidence or make credibility determinations, and it must draw all factual inferences in favor of the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

The moving party bears the initial burden of proving the absence of evidence supporting the non-moving party's claims. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, (1986). If the movant satisfies this burden, the burden then shifts to the non-movant to adduce specific facts

showing that there is a genuine and material dispute of fact for a jury to resolve. Id.; FED. R. CIV. P. 56(e). In doing so, the non-movant "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005). If the non-movant demonstrates that there is a factual dispute that would affect the outcome of the suit under the governing substantive law, and that a reasonable jury could resolve the dispute in the non-movant's favor, the motion for summary judgment must be denied. Liberty Lobby, 477 U.S. at 248.

**C. DISCUSSION**

Richetti asserts three claims in this lawsuit: (1) that Saks retaliated against her for filing a successful petition for workers' compensation benefits, (2) that Saks led her to believe she was on FMLA leave and interfered with her exercise of her FMLA rights by eliminating her job, and (3) that she has suffered severe emotional strife as a result of Saks's actions which deprived her husband of the benefit of her companionship. Because the underlying facts necessary to prove these claims are genuinely in dispute, Saks's motion for summary judgment should be denied.

1. <u>Workers' Compensation Retaliation Claim</u>

Pennsylvania law permits an employee to pursue a common law action for wrongful termination if she is fired for claiming workers' compensation benefits. Shick v. Shirley, 716 A.2d 1231, 1237-38 (Pa. 1998); see also Geary v. United States Steel Corp., 319 A.2d 174, 184-85 (Pa. 1974)(a common law cause of action for wrongful termination may lie for an at-will employee who is discharged in violation of a clear mandate of public policy). Unlike other

9

employment discrimination claims, the employee is not required to obtain administrative clearance before pursuing an action in court. See id.

Federal courts interpreting Pennsylvania law have required the plaintiff to show a causal connection between her claim for workers' compensation benefits and subsequent termination. See, e.g., Deily v. Waste Mgmt. of Allentown, 55 Fed.Appx. 605, 608 (3d Cir. 2003)(applying the Title VII standard for retaliation, where the plaintiff is required to prove that she (1) engaged in a protected activity, (2) that she suffered an adverse employment action either after or contemporaneously with the protected activity, and (3) that there is a causal connection between the protected activity and adverse action to a workers' compensation retaliation claim under Pennsylvania law); Landmesser v. United Air Lines, Inc., 102 F.Supp.2d 273, 277-78 (E.D.Pa. 2000)(same); Griesbaum v. Aventis Pharmaceuticals, 2006 WL 2796160 at *3 (M.D.Pa. Sept. 25, 2006)(citing the previous two cases). In retaliation cases under federal law, the required causal connection between the employee's protected activity and adverse employment action is typically shown through some combination of (1) an unusually suggestive temporal proximity and/or (2) an accompanying pattern of antagonism or retaliatory animus. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).

As a general rule, the closer the timing between the initiation of major action involving the employee's protected activity and the adverse employment action, the more suggestive it is that a causal connection exists between the two. Id. at 280. A period of a few days or weeks ordinarily will, by itself, be sufficient to prove causation; however, a gap of several weeks or months will generally require additional evidence, such as an intervening pattern of antagonism or similar showing of a retaliatory animus, to corroborate that the employee's pursuit of her

employment rights was the cause of her discharge, rather than some other interjecting factor. Id. The reason for this distinction is simple: as a matter of logic, timing is, intrinsically, highly suggestive of causation. When two events occur one right after the other, it is very likely that the first exercised a strong influence on the second; when two events occur farther off in time, the influence of the first over the second becomes increasingly remote, absent some other corroborative evidence that the two are connected. It therefore follows that in a workers' compensation retaliation action under Pennsylvania law, a causal connection may be demonstrated by a gap of only a few weeks between an event involving the claim and the employee's termination. However, when the gap is a several weeks or months, something else is required, like an intervening pattern of antagonism, to connect the two events. See id.

This evidence in this record is sufficient to demonstrate both temporal proximity and an intervening pattern of antagonism. Saks lost its appeal of Richetti's second workers' compensation claim on October 8, 2009; approximately two weeks later, on October 23rd, Saks allegedly terminated her, and did so while Richetti was out on a medical leave that had already been prolonged several times. Richetti also alleges that during her leave, she could not get Zacour to return her calls to discuss her eventual return to work, and claims that when she did talk to her, Zacour made several hostile comments indicating that Saks was displeased with Richetti's continued absence. Although Zacour does not recall making these comments, there is nothing in the record to definitively indicate what exactly transpired. Much to the contrary, the record is full of contradictory documents and varying accounts of key conversations, including the circumstances surrounding Richetti's separation from Saks. Furthermore, all of this occurred against the backdrop of Saks's policy of seeking the termination of those employees who file

11

workers' compensation claims that it deemed meritless, and there is no question here that Saks opposed Richetti's eventually successful claim.

A reasonable jury could interpret this evidence as proof that Saks was angry with Richetti for succeeding on what it perceived to be a meritless workers' compensation claim, anger which was only exacerbated by Richetti's continued absence from work following surgery, and that Saks sought to cut its losses by pushing Richetti out the door. Thus, the resolution of these issues, all of which are material to Richetti's retaliation claim, will necessitate credibility assessments and factual determinations that can be made only by a jury. Saks's motion for summary judgment on this claim should therefore be denied.

### 2. FMLA Interference and Discrimination Claim

The FMLA allows an eligible employee to take 12 weeks of continuous medical leave and be restored to either the same or a functionally equivalent position upon her return. 29 U.S.C. §§ 2612, 2614. To be eligible for FMLA benefits, an employee must have worked at least 1,250 hours during the previous 12-month period. Id. at § 2611(2)(A)(ii). Employers may not interfere with or discriminate against their employees for taking advantage of the rights granted to them under the FMLA. Id. at § 2615(a).

The parties do not dispute that due to her part-time schedule, Richetti does not meet the statutory requirements to be an "eligible employee." However, Richetti argues that Saks led to her to believe that her medical leave was covered by the FMLA, and claims that had Saks informed her otherwise, she would have pursued an alternative course of treatment for her knee that would not have necessitated medical leave and would not have resulted in the loss of her job.

12

Thus, Richetti submits that Saks should be equitably estopped from claiming that she is not eligible for FMLA benefits. Saks rejects the application of equitable estoppel to Richetti's FMLA claim.

### a. Equitable Estoppel and the FMLA

Equitable estoppel prevents a party from profiting from a definite factual misrepresentation it made to another who reasonably relied on the misrepresentation and was harmed as a result. Heckler v. Comm. Health Svcs. Of Crawford Cnty., Inc., 467 U.S. 51, 59 (1984). Several courts of appeals have concluded that the doctrine of equitable estoppel may be applied in FMLA actions. See, e.g., Dobrowski v. Jay Dee Contractors, Inc. 571 F.3d 551, 554-55 (6th Cir. 2009); Reed v. Lear Corp., 556 F.3d 674, 678 (8th Cir. 2009); Minard v. ITC Deltacom Communications, Inc., 447 F.3d 352, 358–59 (5th Cir. 2006); Woodford v. Cmty. Action of Greene Cnty., Inc., 268 F.3d 51, 57 (2d Cir. 2001); Dormeyer v. Comerica Bank–Ill., 223 F.3d 579, 582 (7th Cir. 2000).

Although the Court of Appeals for the Third Circuit has not definitively addressed the issue, it has upheld, albeit in a non-precedential opinion, the application of equitable estoppel to an FMLA retaliation and discrimination claim, even though it found that the plaintiff had failed to prove the elements of the doctrine in her particular case. Leese v. Adelphoi Village, Inc., 2013 WL 1113347 (3d Cir. March 19, 2013), aff'g 2012 WL 2049480 (M.D.Pa. March 26, 2012). This holding is consistent with the long-established principle that equitable doctrines will be applied to federal statutes unless Congress expressly intends otherwise. Bomba v. W.L. Belvidere, Inc., 579 F.2d 1067, 1070 (7th Cir. 1978)(citing Glus v. Brooklyn Eastern Dist.

13

Terminal, 359 U.S. 231, 233-35 (1959)). Thus, the weight of authority favors applying equitable estoppel here.

To prevail on an equitable estoppel claim, a party must show: "(1) a misrepresentation by another party; (2) which [she] reasonably relied upon; (3) to [her] detriment." United States v. Asmar, 827 F.2d 907, 912 (3d Cir. 1987)(citing Heckler, 467 U.S. at 59, and *Restatement (Second) of Torts* § 894(1) (1979)). The party claiming estoppel bears the burden of proof. Id. While several traditional sources, such as the *Restatement (Second)*, have phrased the rule to require the plaintiff to "change her position" in reasonable reliance on the misrepresentation, the doctrine is remedial in nature and is intended to be applied flexibly. Thus, courts have not hesitated to invoke equitable estoppel in cases where the misrepresentation encouraged the plaintiff to refrain from taking some action that would have avoided some detrimental result. See id. Finally, those courts of appeals that have applied equitable estoppel to FMLA claims have not required the party claiming the applicability of the doctrine to show that the representing party acted with scienter in making the misrepresentation; it is sufficient that the representation itself was objectively false. See Dobrowski, 571 F.3d at 556.

### b. Richetti's FMLA Equitable Estoppel Claim

The evidence in this record is unclear as to what representations Zacour made to Richetti about the status of her leave at their July 23rd meeting and whether Richetti actually relied on anything Zacour said in choosing to take a medical absence. After her meeting with Zacour, Richetti testified that it was her impression that she would be on her "usual medical leave," referring to at least one past health-related leave that Saks appears to have considered, either

14

rightly or wrongly, FMLA leave. (See ECF No. 38-27.) On subsequent personnel paperwork, Zacour does not deny that she indicated, albeit mistakenly, that Richetti's 2009 medical leave was FMLA leave. There is also the September 1st letter which plainly discusses Saks's policies regarding leave taken in accordance with "FMLA guidelines." This evidence lends credence to Richetti's version of events, that she was led to believe up front that her leave was FMLA leave and she should expect that her job would be waiting for her when she got back, thus prompting her to go ahead with her knee surgery.

However, the document that Zacour filled out and that Richetti signed at their July 23rd meeting very clearly does not have the "FMLA Leave" box checked, and there is no doubt that Richetti never saw the internal Saks form where Zacour indicated that Richetti's leave was FMLA leave, all of which support Saks's argument that nobody ever told Richetti she was on FMLA leave before she had surgery. Furthermore, there is the disputed meaning of Richetti's having scheduled her surgery with Dr. DeMeo prior to discussing her leave options with Zacour: Richetti says she would have pursued a different treatment option had Zacour told her that she was ineligible for FMLA leave, while Saks claims this demonstrates that Richetti intended to have the surgery no matter what. Thus, there is a genuine factual dispute as to whether Zacour told Richetti on July 23rd that she would be out on FMLA leave, as well as whether Richetti would have altered her plans for surgery to avoid the risk of losing her job, which she ultimately did. Only a jury can resolve these issues.

Because the material facts underlying Richetti's equitable estoppel claim are genuinely in dispute, Saks's motion for summary judgment on this claim should be denied.

### 3. Loss of Consortium Claim and Motion for Partial Summary Judgment

Saks's argument for summary dismissal of Richetti's husband's loss of consortium claim is predicated entirely on its motion for summary judgment on Richetti's workers' compensation retaliation and FMLA interference claims.  Because this court has recommended that those claims should survive summary judgment, it is also recommended that Saks's motion for summary judgment on Richetti's husband's loss of consortium claim also be denied. Similarly, Saks's motion in the alternative for partial summary judgment on Richetti's request for punitive damages and back pay should also be denied, given that the applicability of this relief will depend on the facts adduced at trial.

### III. CONCLUSION

Based on the foregoing discussion, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 53) be denied.  In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) & (C) and the Local Rules of Court, the parties shall have fourteen days from the date of the service of this Report & Recommendation to file written objections thereto.  Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response.  A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

May 28, 2013.

            */s/ Cynthia Reed Eddy*
            Cynthia Reed Eddy
            United States Magistrate Judge

cc: all counsel of record